UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MICHAEL RAMSHAW, MIDAMERICA EQUIPMENT SOLUTIONS, LLC, and GEP AMERICA, LLC, <br><br>Plaintiffs,<br><br>v.<br><br>BERNHARD EHRET and GLOBAL EHRET PROCESSING TECHNOLOGY d/b/a GEP GERMANY GMBH,<br><br>Defendants. | No.   4:20-CV-00359-NCC |

## MEMORANDUM AND ORDER

This matter is before the Court for a determination of damages upon the entry of default judgment as a sanction for Defendants' misconduct. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c) (Doc. 123). For the following reasons, the Court will enter judgment for Plaintiffs and against Defendants in the amount of **$988,913.48**, with additional monetary sanctions in the amount of **$57,937.84**.

### I.  BACKGROUND

The Court will not belabor the history of this case and of Defendants' misconduct, which has been reviewed at length in prior orders. *See generally* Doc. 133. The Court previously entered default judgment on Count IV against both Defendants (Doc. 133), and held a hearing on September 26, 2023 to determine damages (Doc. 135). Plaintiff Michael Ramshaw ("Ramshaw") was present, for himself and as the representative for Plaintiffs MidAmerica Equipment Solutions ("MidAmerica") and GEP America. Attorney Pete Woods appeared on

behalf of Plaintiffs.  Defendant Bernhard Ehret ("Ehret") was present, for himself and as the representative for Defendant Global Ehret Processing Technology ("GEP Germany").  Attorney Joe Jacobson appeared on behalf of Defendants.  The undersigned heard testimony from Ramshaw, allowed attorney Jacobson to proffer testimony from Ehret, and took the matter under advisement.

## II.  FINDINGS OF FACT

The undersigned finds Michael Ramshaw credible.  At the hearing, Ramshaw testified that, per his agreement with Ehret, he used his contacts within the industry and created marketing and e-mail blasts to generate sales for GEP Germany (Doc. 142 at 12).  He lost other sales opportunities as a result of his efforts (*id.* at 13).  Time spent selling GEP Germany's equipment was time spent away from work for MidAmerica, and GEP Germany could not produce products in the time frame in which certain clients wanted to purchase them (*id.* at 14).  Over four years, Ramshaw's sales efforts produced approximately $10.5 million in GEP Germany equipment sales (*id.*).

In the first sale Ehret made with Ramshaw, to CP Direct, a sale negotiated by Ehret, Ehret did not provide the client with what they wanted and later blamed it on Ramshaw who was brought into CP Direct's lawsuit (*id.* at 38-39).  CP Direct did not complain until Ehret was two years behind on delivering the folders for the line he promised (*id.* at 40).  In the sale to Jetson Specialty Mailing (JSM), JSM did not pay their balance because Ehret never provided the proper equipment, not because Ramshaw waived the cost of delivery, installation, and training (*id.* at 41-42).  Ramshaw did not have that authority (*id.*).  Ehret took the order in April, was supposed to deliver it in four months, and it did not show up until September or October, costing JSM

2

$250,000 in losses on jobs they were going to perform as part of the U.S. Census (*id.* at 42). Ramshaw also did not offer free delivery and installation for LS Direct (*id.* at 45-46).

GEP Germany was selling buckle folders when they did not have buckle folders, and when Ehret had not started developing their buckle folder yet (*id.* at 42-43). JSM was the first to receive one and it was a "complete disaster" (*id.*). GEP Germany sold one to Resource One, as well (*id.*). The only input Ramshaw had was to advise Ehret to purchase a folder on which the patents had expired and copy it exactly (*id.* at 43-44). Ehret decided to put his own twist on it and only copied it about 70 percent (*id.*). When the machine was not running right at JSM, Ramshaw asked Ehret if he had tested the folder before he shipped it (*id.*). He said yes, that he had run paper through the first plate (*id.*). According to Ramshaw, that is like saying you tested a car only in first gear (*id.*). Ehret never tested the second plate, the third plate, the fourth plate, the fifth plate (*id.*). Ramshaw testified Ehret was the engineer (*id.*). It was his baby (*id.*). He did not listen to anybody (*id.*). When JSM's machine was not running, under Ehret's direction, Ramshaw sent in Floyd Hostetler (*id.*). Hostetler fixed the problem (*id.*). The customer gave him a hug and said if it was not for him, the machine would not be running because Ehret had already booked flights for his techs to go back to Germany (*id.*). When Hostetler sent invoices to Ehret for his work, Ehret said he was not paying him because he did not authorize him to go over there (*id.*). Hostetler did the same thing for Summit Direct (*id.* at 44-45). He did the same thing for LS Direct and was not paid by Ehret (*id.*). Hostetler got the machines running so Ehret could get paid, but then Ehret refused to pay him (*id.*).

Eventually, MidAmerica had to pay for shipping and the costs of certain items because GEP Germany had no credit line in the United States (*id.* at 15). Ramshaw had to pay expenses

because they were on his credit line in the United States (*id.* at 30).  When GEP Germany did not pay the people who helped with the sale and the sale contact, GEP America stepped in and the sale would be billed through them (*id.* at 19).

Ramshaw retained payments from sales to MSP, Summit Direct, and FSSI and used that money to pay vendors (*id.* at 31).  MSP and Summit Direct started out with GEP Germany, but when it got down to the funds being transferred, they wanted Ramshaw to file the invoice (*id.*).  MSP was referred by Ramshaw's friend Bill Troutman, so Ramshaw and Troutman each received a 12.5% commission (*id.* at 46-47).  With their first two orders, Ehret failed to pay Troutman his commissions (*id.* at 46-47, 50-51).  But Ehret wanted another sale from MSP (*id.* at 48).  MSP only went through with a third order on the condition that GEP America issue the invoice and handle the money so Troutman would be paid upfront (*id.* at 46-47, 50-51).  As soon as Ramshaw received the funds, he wired Ehret his part and paid Troutman upfront (*id.*).  Ehret knew why GEP America was invoicing MSP, agreed to it, and never questioned it (*id.* at 49-51).  Similarly, Ehret agreed to GEP America invoicing Summit Direct because the client did not want to pay a foreign entity and wanted to deal directly with a U.S. bank due to concerns of wire fraud (*id.* at 52).  By agreement with Ehret, FSSI's initial contract was with both GEP America and GEP Germany (*id.* at 32, 53-54).  FSSI was going to lease the equipment, but U.S. leasing companies would not lease and pay a German company (*id.* at 53-54).  That is why the invoice was changed to come from GEP America (*id.*).  Ehret was in complete agreement with it.  Everyone was in complete understanding about how the documents were going to flow and payment (*id.*).

Ramshaw only retained payments from MSP, Summit Direct, and FSSI when he realized he was not going to get paid from GEP Germany on anything (*id.* at 32). In May of 2019, Ehret told Ramshaw that Ramshaw would be paid $135,000 when RR Donnelly paid GEP Germany (*id.* at 35-36, 54). But Ehret received the RR Donnelly payment in August or early September and did not tell Ramshaw (*id.*). After confronting Ehret, Ramshaw kept funds from MSP, Summit Direct, and FSSI to pay off Ramshaw's credit line that Ehret was using, which was over $200,000 (*id.*). He had not received anything from Ehret since May 2019 and knew he would not be paid (*id.*). Ehret continued to use Ramshaw's credit line into January and February of 2020 (*id.* at 54-55). He used Ramshaw's credit line to bill shipping on a sale to Janel Group after he had terminated his relationship with Ramshaw (*id.*). He also used it to bill shipping on a sale to LS Direct and did not tell Ramshaw (*id.*). Ramshaw found out through looking at invoices (*id.*). Ramshaw still has not been paid anything on the prior monetary sanctions ordered by this Court (*id.* at 35).

Ramshaw testified to the calculation of total damages (*id.* at 32-34). Total unpaid commissions plus prejudgment interest of 9% from the sale date through September 30, 2023 equals **$1,190,035** (Pl. Ex. 1). Total unreimbursed expenses equals **$197, 371.81** (Pl. Ex. 2). Thus, the sum of total unpaid commissions plus prejudgment interest and total unreimbursed expenses equals **$1,387,406.81** (Doc. 142 at 33). Ramshaw then credited the retained payments from MSP, Summit Direct, and FSSI, which totaled **$348,591.96** (*id.* at 32-34; Doc. 113-1 ¶ 12). The total credit exceeds total unreimbursed expenses by **$151,219.19** (*id.* ¶ 13). Ramshaw calculated prejudgment interest on that amount, equaling **$49,902.33**. *See* Doc. 113-1 ¶ 13.[1]

---

[1] The original figure was $40,829.18. The Court obtained an updated figure from

5

The excess amount plus prejudgment interest equals **$201,121.52**.  Total unpaid commission plus prejudgment interest minus that excess amount plus prejudgment interest equals **$988,913.48**.[2]  Defense counsel sought to present testimony from Ehret in rebuttal and the Court permitted defense counsel to make an offer of proof (Doc. 142 at 66-73).

Finally, Attorney Woods testified regarding attorney's fees and costs (Doc. 142 at 76-81). Fees and costs in the amount of **$27,655.84** reflect work performed during the period from August 25, 2022 (the last period for which sanctions in the form of attorney's fees and costs had been previously assessed in prior orders) and up to the entry of Doc. 112 requiring that "Defendant Bernhard Ehret shall pay to Plaintiffs their reasonable attorney fees and costs incurred in addressing his noncompliance with the discovery rules and court orders, in an amount to be determined at a later date." (Doc. 112 at 9).  Additional fees and costs in the amount of **$16,353** are associated with the period from December 15, 2022 through January 6, 2023 (the date of submission of pleadings addressing the Defendants' sanctionable conduct, including the presentation of those fees), for a total through January 6, 2023 of **$44,008.84**.  And additional fees (but not costs) in the amount of $13,929 are associated with the period from January 6, 2023 through September 26, 2023 (the date of submission of all evidence addressing the Defendants' sanctionable conduct, including the presentation of those fees at the damages hearing), for a grand total of **$57,937.84**.  *See* Doc. 142 at 76-81; Pl. Exs. 7-7A.

---

Plaintiffs reflecting interest through September 30, 2023.

[2] Plaintiffs' proposed judgment merely deducts the approximate credit amount of $385,000 from the sum of total unpaid commissions plus prejudgment interest and total unreimbursed expenses (Doc. 140 at 3).  However, $385,000 was Ramshaw's approximate recollection in his testimony.  *See* Doc. 142 at 32.  The affidavit submitted previously contains a more precise accounting.  *See* Doc. 113-1 ¶¶ 12-13.

### III. STANDARD

"Upon default, the factual allegations of a complaint (except those relating to the amount of damages) are taken as true, but it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law." *Murray v. Lene*, 595 F.3d 868, 871 (8th Cir. 2010) (internal quotation omitted); *see also* Fed. R. Civ. P. 8(b)(6) ("An allegation – other than one relating to the amount of damages – is admitted if a responsive pleading is required and the allegation is not denied."). Once the court determines a party is entitled to default judgment, it must ascertain the amount of damages and determine any other appropriate relief. *See Hagen v. Sisseton-Wahpeton Cmty. Coll.*, 205 F.3d 1040, 1042 (8th Cir. 2000).

When a court enters default judgment on a claim for an uncertain amount of damages, it may determine damages by holding a supplemental hearing or based upon affidavits and documentary evidence supplied by the plaintiff. *Taylor v. City of Ballwin, Mo.*, 859 F.2d 1330, 1333 (8th Cir. 1988). There is a "distinction between facts that relate to liability and facts that relate to the amount of damages." *Cutcliff v. Reuter*, 791 F.3d 875, 882 (8th Cir. 2015). "A defaulted claim … precludes a party from contesting the facts in the complaint that establish liability" while "facts that relate to the amount of the plaintiff's damages … are fair game." *Id.* at 882-83. Notwithstanding the defendant's default, the plaintiff must prove actual damages "to a reasonable degree of certainty." *Everyday Learning Corp. v. Larson*, 242 F.3d 815, 819 (8th Cir. 2001).

## IV.  CONCLUSIONS OF LAW

The Court previously found that Plaintiffs were entitled to default judgment on Count IV for unjust enrichment against both Defendants, rejecting Defendants' argument that Ehret could not be held personally liable (Doc. 133 at 7-9).  Ehret is the sole owner of GEP Germany (Doc. 142 at 9-10).  The Complaint sufficiently alleges both GEP Germany *and* Ehret were unjustly enriched.  *See* Doc. 1 at 9.  In addition, the Court takes as true the facts pled in the Complaint that Ehret represented he would pay at least a 10% commission rate (Doc. 1 ¶¶ 15, 48, 50) and reimburse for all expenses and costs involving shipping, installation, and servicing of equipment (*id.* ¶¶ 16, 25-26).

The Court notes that defense counsel conceded that Defendants did not have the right to present additional evidence and requested only the right to cross-examination in requesting a hearing on damages.  *See* Doc. 129 at 6.  Defendants, who have routinely engaged in misconduct in the more than three years that this action has been pending, summarily argued that there were "gross inadequacies" in Plaintiffs' calculation of damages (Doc. 118 at 12-13).  Notwithstanding the anemic nature of their challenge, out of an abundance of caution, the Court held a hearing on damages and permitted Defendants their desired opportunity for cross-examination.  On the eve of the hearing, Defendants reversed their position and requested to present testimony from Ehret, *see* Doc. 142 at 5, based on a Fifth Circuit case cited in the first instance by this Court, *see* Doc. 133 at 11 (citing *Law Funder, L.L.C. v. Munoz*, 924 F.3d 753, 758–62 (5th Cir. 2019)).

The Court finds that Defendants previously waived their right to present additional evidence and further finds that they were not entitled to present Ehret's testimony.  The *Law Funder* case is not binding on this Court and is sufficiently distinguishable from the case at hand.

8

*Law Funder* involved an award of damages on a legal malpractice claim that the Fifth Circuit Court of Appeals found "confounding" because, for example, the district court awarded damages incurred *before* the plaintiff retained the defendant. See *Law Funder*, 924 F.3d at 760-61. Moreover, the Court finds that Ehret's testimony would not be credible given his history of misconduct and obstructionism in this case. *See generally* Doc. 133.

Finally, the Court notes that Ehret's personal liability for unjust enrichment has already been determined and that Defendants' discovery violations and the corresponding sanctions warrant a presumption of personal liability. *See Digital Filing Sys., L.L.C. v. Aditya Int'l*, 323 F. App'x 407, 419 (6th Cir. 2009) ("In determining damages, parties should not be rewarded for failing to respond or cooperate with discovery.") (collecting cases); *NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 617 (9th Cir. 2016) (upholding district court's rejection of claim that evidence of damages was unreliable because defendant's discovery violations necessitated plaintiff's reliance on certain evidence); *see also Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, 707–08 (8th Cir. 2018) (upholding exclusion of expert opinion as sanction and granting summary judgment due to the lack of expert opinion evidence).

Finding Ramshaw credible and Ehret not credible, and after careful consideration of the equities of the matter, the Court finds that both GEP Germany and Ehret were unjustly enriched by the retention of unpaid commissions and unreimbursed expenses. The Court will enter judgment for Plaintiffs and against Defendants, jointly and severally, in the amount of **$988,913.48**, with additional monetary sanctions in the amount of **$57,937.84**[3].

---

[3] The Court finds that fees and costs incurred from August 25, 2022 through the damages hearing on September 26, 2023 are sufficiently related to the Court's prior sanctions orders. *See* Doc. 112 at 9-10 (sanctioning Defendants by striking Ehret's Answer and awarding attorney's

## V.  CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that judgment is entered for Plaintiffs and against Defendants, jointly and severally, in the amount of **$988,913.48**, with additional monetary sanctions in the amount of **$57,937.84**.

A separate final judgment shall be entered incorporating this Memorandum and Order.

Dated this 22nd day of November, 2023.

    /s/ Noelle C. Collins
NOELLE C. COLLINS
UNITED STATES MAGISTRATE JUDGE

---

fees and ordering Plaintiffs to file an appropriate motion for default judgment, stating specifically "Defendant Bernhard Ehret shall pay to Plaintiffs their reasonable attorney fees and costs incurred in addressing his noncompliance with the discovery rules and court orders, in an amount to be determined at a later date.").